Madam Clerk, please call the next case. 315-0067, Wall Clipper Corporation v. Jack Lee Hickman Counselor, you may proceed. Thank you and good morning. Brad Edward on behalf of Wall Clipper. Our brief focused on the issues of accident and causation. And what I'd like to talk to you about briefly here today is the issue of the credibility of the petitioner in this case. And I fully understand the law respecting the Commission's decision. And you being an experienced practitioner, you know that very well, don't you? Yeah, I do. I think I know that very well. But I think the question that we need to look at with this case is how far do we go in affirming a decision of the Commission where the record, as we believe, shows that the petitioner is just entirely uncredible and that no reasonable person could look at this record and conclude that she was, in fact, a credible person. And I understand the law about deference to the Commission versus the arbitrator. But I would remind the Court that this is a case where the arbitrator did deny the claim and found her not credible, and it was reversed 2-1 by the Commission. Now, the points that I'd like to focus on really stem from the medical records. And I know there was a comment made in one of the arguments earlier this morning about the significance of what a person tells a doctor when they go in for treatment and how that might be a better indicator of what the person's true history of an accident or condition might be because it's closer to the accident, and at the time they go in, they're not seeking compensation. They're seeking medical care to make themselves better. And with that in mind, what I would like this Court to do as you're deliberating the issues in this case is to go back and focus on five dates in the documents that are affiliated with those dates because I think those, and I'll tell you what those are in just a second, but I think that those documents really lay out the case that we're making here, that this is a situation, one of the rare situations, where the manifest way of the evidence shows that the petitioner is not credible. And those dates are July 8th. The document that I'd like you to look at there in detail is the report that came to Dr. Dinka a week prior to her accident where we clearly got documented back and shoulder problems, pain, complaints. There's a limitation of movement on the right shoulder. I think that's a very important point for many reasons. The July 15th entry with Dr. Dinka, that's the date of the purported accident here. And I think the critical part of that document is that she makes no complaints of a work-related accident or a work-related injury on the day of her injury. And it's interesting because throughout the medical in this case, throughout the statement that she gave to the insurance company, she painted one version of how this accident occurred. Basically, she was reaching or she was pulling a hoist. When she testified at arbitration all of a sudden, now she's reaching up and pulling on a hoist that pulls her off the ground and tugs her off the ground. And she hears a pop and she feels a pop. And she has pain that starts basically not immediately but very shortly thereafter, which is the first time in the entire history of this case that those particular facts come out. Now, when we look at the July 15th entry, Dr. Dinka's record, we don't see anything that describes a work accident, anything that describes an accident of that nature. And more importantly, we don't see anything where we look at a petitioner who's collaring in pain. Was this alleged accident witnessed by anybody? I'm sorry? Were there any witnesses to this alleged accident? I would assume. Wasn't she helping somebody? She was helping somebody named Amy. And I don't know if the record's clear that Amy actually saw what happened. I think we could assume she probably did, but she did not testify. Mr. Allward, because of the July 8th, 2008 record, you said that was Dr. Dinka's record? I think it was Dr. Dinka. It was at his clinic. It was not him in particular, but it was in his series of medical records that came from the same facility. Would you indicate on page 25 of your brief that Dr. Rosman was not aware of the July 8th, 2008 note of Morrison Community Hospital? Would it be that? That is the record, yes. Those are the records that are with Morris Community Hospital, and those are Dr. That's where you'll find Dr. Dinka. And I think at one time his physician's assistant also examined and was in that body of records as well. And just while we're on that record, then, I was confused because you indicate in your brief that Rosman was not aware of that note. And then in the Appleby's brief, Claimant states Dr. Rosman explained that in addressing causation, he did take into account the July 8th, 2008 medical record from a week before the accident. So which is it? Well, I think when we look at the question that was presented to Dr. Rosman, he was confronted with the medical record of July 8th, and he was asked about that. And I think the critical part is how he answered the question. There were complaints and findings in that visit of July 8th, respecting her chest, her arm, and her back. And he was asked that question, does this document change your opinion? And his answer was limited to the chest. He never spoke about the shoulder. He never spoke about the back. So while Dr. Rosman, while he was given that or confronted with that, his answer is really a non-answer. He chose one aspect of it and said, well, the chest pain wouldn't be indicative of shoulder condition. But he ignores the comments that are clear of a shoulder problem, and not only a shoulder problem, a shoulder problem that limits her motion. So I think that's the important part and the important distinction with his record. Now, the other three documents I think we need to look at closely are the July 22nd report, again from the same facility. Petitioner did not report a work accident. She did not report any type of injury that she described at arbitration or anything to do with her employment. She did not report any types of physical problems that would correlate with what she testified to at arbitration. I had a large knot on the back of my shoulder, and it was painful to touch. You couldn't touch it. Where is that in the medical? It's not in there. Let me ask you this, Mr. Elwood, just to try to expedite this. What rule, in light of the fact that you have passively acknowledged or expressly acknowledged that the credibility findings in the weight are within the province of the commission, what rule would we announce in overturning the commission here that doesn't do violence to the credibility of the well-settled rule about credibility of the witnesses? What rule do we announce here? Well, and I know we've had this discussion in many other cases about exactly what we should do. What do we say? But I think what you say here is that you look at this case and you say, look, the manifest weight of the evidence demonstrates that the petitioner is not credible. While credibility is normally a question for the commission here, the overwhelming evidence, as indicated by these various medical records, which were concurrent with or very shortly after the reported accident, cut against entirely her credibility to the point where she is not believable. Because as we said earlier, the medical records at the time or in that time frame following the accident do not support the indication of an accident, do not support the types of complaints that she was voicing. They're wholly inconsistent with that. As a matter of fact, you wouldn't even know she had been injured at work if you looked at these records. And I think you can couch an opinion on those facts and cover them with the Shell Oil case that we cited to show that this case is against the manifest weight of the evidence. And you don't have to address the issue of I'm deferring more to the arbitrator who saw the witness. You don't even need to go down that path. And I know you've talked about that in prior decisions. So I'm not asking you to go there. I'm saying on this record, with this medical, the July 8th, July 15th, July 22nd, the July 29th report of CGH Medical Center, page C191 of the record, she goes in for an X-ray of her shoulder. And they put down cause or reason for the X-ray. She says a fall. And then she's confronted with that at arbitration. And she's asked, well, did you go into this hospital and did you tell them that you fell and hurt your right shoulder? No, I didn't. It just goes through the credibility, and it builds in with those documents. The last document I ask is the August 8th, 2008 statement that she gave. And the benefit of that is the history that she gives of her accident is entirely inconsistent with what she testified to at arbitration. The significant part, there was no mention of a pop. There was no mention of her being left off the ground. And why is that important in this case? Because when our doctor, I'm trying to remember if it was Dr. Weiss or Dr. Bergen, but one of our doctors made a comment that basically this type of movement that she told me about, basically reaching six or seven or eight times, is not the type of mechanism that's going to produce this type of injury. You're not disputing, are you, that there was never any poise involved, that this whole thing was made up? And I understand the pop and the missing records, but is that a case where the mechanism of injury was disputed? Well, no, this is a case of the mechanism of the injury becomes important when we look at what Dr. Asner was asked. Remember, we've got a lady who's complaining for a period of about six or seven months of shoulder pain, shoulder pain, shoulder pain. She has an MRI in August that shows a long-standing stenosis condition, degenerative condition, over multiple levels of her cervical spine. In November, we have a new MRI that all of a sudden, for the first time, shows a herniated disc at C6-7. And the finding on that report is acute. This looks acute. So it becomes important to say, Dr. Asner, how can what you were told on how this accident occurred cause a cervical herniation? You're not disputing that there was a hoist incident. Can we get that much? This isn't a case where somebody's out in the field by themself and we don't even know if there was anything around, any possible mechanism. You're not disputing there was a hoist involved, are you, saying we don't believe she ever was near a hoist? No, I think from the record, I think she was working with a hoist, I think. Okay, good. So we got that. So, and that means two things. You are disputing the mechanism of the accident to the extent you don't think that she's credible in saying that it lifted her off the ground. Right. There was a pulling down of the hoist, which is one description of the accident, and then there's a reaching for the hoist and it pulling her off the ground as a second description, and it's that second description that you take issue with. Yes, that's exactly true. And because when you look at the medical IME reports that came out, they said that the mechanism of injury as described to us is simply pulling down the hoist. It's not going to cause this type of condition, whereas all of a sudden she gets to the arbitration and now we've got the pop. Now we've got the reaching and grabbing and being pulled off the ground. It would be a completely different mechanism for the accident. But even looking at what Asner testified to, based on what history he was given, he can't even say that based on the history of the claim he gave me that I can cause and relate that to the conditions that I found on the MRI. And so when you look at all of those together and then you throw into the mix. Now, which history was he given as to the mechanism of injury? I think he was given, I want to say, reaching for a hoist seven or eight times is what I think he was given. It's not a lifting. No, no. My recollection is the first lift comments came at the arbitration. And also, against the backdrop of everything that we've talked about, against the backdrop of those five documents, we have Dr. Grove and Dr. Weiss testifying that they believe that there was evidence of symptom magnification. So you've got inconsistent descriptions of the accident. You've got failure to report an injury on the date of the injury and shortly thereafter. You've got the incident with the fall at the end of July, which she claimed at the time of the treatment, I'm getting an X-ray because I fell and hurt my shoulder, and then she denies. You've got this incident that really nobody really investigated too much in November of this pop in her head where she claimed it sounded like a shotgun going off and that she had a lot of follow-up pain and discomfort after that. And then you couple that with the fact that two doctors found that she was exacerbating her symptoms and symptom magnification is present. This is clearly that rare case where the Manifest Way to the Evidence Standard has been met. And she's just not credible. And if she's not credible, then all that stuff that she told her doctors goes out the window as well. And that leaves us with our medical opinions that we have a preexisting degenerative condition, which is seriously what is shown on the MRI that was taken in August. It was a significant degenerative condition. And that's just not compensable as a part of this employment. And, again, I want to go back and point out when we look at the August MRI and we see what that film showed and we compare that to what the film showed in November, we have a herniated disc at C6-7 that appears, that's described as acute. That wasn't shown in August. And what that suggests to me as someone who handles cases in this area is that you've got a progression of a degenerative condition, and it continues to deteriorate. And we know from the record of July 8th that she had problems with her right shoulder, significant enough to cause a limitation or restriction of movement on her right shoulder prior to this alleged accident on the 15th. And that's significant. So it fits into the pattern of a preexisting degenerative condition. We've got significant dramatic credibility issues. And we think this is one of those rare cases where the Manifest Way to the Evidence does support the reverse. Thank you. Thank you, Counsel. Counsel, you may respond. Todd Reese on behalf of the Appellee. Counsel. May it please the Justices. Your Honors, Counsel's gone over. He's focused on the credibility. We've heard the arguments. This is my first time in front of you, and I appreciate that. Thank you. I've not had the chance to listen to those arguments before, as Counsel has, but that is educational. The credibility issue is a big thing, but as you know and are aware, that is with the Commission in their preview. The claimant was credible, and the Commission was correct. I'll take a look at these medical records and address those first. Counsel keeps pointing to this July 8, 2008 record. It does mention a shoulder, some pain in the shoulder area. But it also, if you look at that record, goes on to say because of pain in the chest. Does it say pain, or does it say limitation of movement? It does say limitation.  The patient is complaining of pain in the right side of the chest and also the right shoulder and also in the back. She said that she has this pain mainly in the morning when she wakes up. And with that, she sometimes has limitations, limitation of movement of the right shoulder because of the pain in the chest. The diagnosis on that date was muscular strain of the chest, hypothyroid. What is of particular importance is that you go back one more note to June 30, 2008. That is the beginning of that treatment. She had a sickness, an illness of the chest and a bad cough, and that's what started that. The July 8 is the follow-up visit for that, and it continues that treatment. And she mentions pain going into her shoulder or in that area. There is no exam done of the shoulder. There is no reference to work activity of any kind or a work accident or any type of accident with regards to the shoulder. There is no mention of the neck on that July 8. The very next treatment date we have is July 15, the date of the accident. And coincidentally, that just happened to be scheduled that day. She does go into the doctor and follow-up of her chest. Now she has the incident at work with this voice. She does mention work activity. She does not go into detail about the work accident. That's clear from the note. But that doesn't mean that she did not discuss it. We're just talking about what is not in there. There is nothing inconsistent with that history from what she has testified at trial.  But what we do have is maybe there wasn't all of the information provided in that document. I'm not saying, or what I'm saying is, it's just not indicated in that document. I believe that she told the doctors about this incident or at that beginning stage indicated, I'm at work, this voice is going up seven or eight times, and I've got my shoulder problem. Accident date July 15, 2008. She goes to the doctor. She mentions it. It shows work activity. July 22, 2008. She goes to the doctor. The note specifically indicates injury one week prior. When did she report the accident to the court? She reported the accident the very next day on July 16. What did she say in that statement? She told her supervisor what I believe she told us. She told her supervisor that she was working in her station. Another employee needed help. She went down to help her because the voice was going up. It went up a couple times. She pulled it down. She came back. By the time she got back to her station, it went back up. So she went back down there, and it went up seven or eight times at that time, and at one point jerked her up. She reported that to the employer the next day? Correct. Verbally. There is an incident report that is contained within the record. What does that say? In the incident report, sonic lift kept going up by itself. Dash malfunction. Could this have been prevented? This is the employee's deployment. Not sure, but it needs to be looked at. I let John Wooden know after it happened. Signed by Jackie Mason, July 22nd. Any witnesses to this? There are three witnesses, Your Honor. A Julia Heria, Amy, and Diane. Those three were not called as testifiers. Did they provide any statements to the employer? I do not have any statements. There is a statement attached to the incident report. Nobody called them. Employer didn't call them either. I'm sorry? Employer didn't call them either. They did not. Okay. The incident report is located at page 1024 of your record. All on that report, which I was going to bring up, which is very important, the hoist was identified as malfunctioned and the hoist was replaced. And that's indicated on this incident report. That's the date of July 22nd. You're saying in summary that he is pointing out he's a strictly manager of credibility for the commission and obviously they believe the claim. Correct. I'd ask that you affirm or agree with the commission. Thank you. Thank you, counsel. I just have a couple points. If she was injured to the extent that she was by this purported accident that took place, where are the concurrent medical from 715, 722, 729 that document that? Where does she report a traumatic event? Where does she give any history at all of a work-related accident? And more importantly, where is there any type of complaint of the physical problem of a lump, a swollen lump on the back or shoulder, whatever she wants to call it, that would correlate to what she testified to at arbitration? The answer is there's not. I think that's imperatively important here. If she was hurt as bad as she represented at arbitration, those findings would have been in those medical records and they would have appeared in 715, 722, 729, 730. We wouldn't have heard about those for the first time at arbitration. Now, there was some discussion here about whether this is a traumatic event or whether it's a repetitive trauma type of event, and there were some histories given to a few of the medical providers about something akin to a repetitive trauma, but I would say this, the only evidence in the record that there might be, the only medical opinion evidence that would relate to a repetitive trauma came from Dr. Bergen, who reviewed the video and listened to the history and said this type of activity is, one, not repetitive and, two, would not cause the conditions that I've seen. So the only medical opinion on a repetitive would come from our IME, and he says no. So that throws that issue out. So then we come back to whether or not we've got a traumatic event, and that's what brings the points that I brought earlier into context and justifies, I think, why we have a situation here where the manifest weight standard has been met. So I guess I would also leave you with this. Simply because there's a malfunction with a piece of equipment doesn't mean that we have a compensable accident  or how it would have caused the injury. And I go back to their own doctor, Dr. Asner. Based on what he was told, he can't say how the description of the accident that he got would mechanically or physically or from a physics perspective, as he put it, lead to a finding of a cervical herniation that was found in the MRI of November. If he can't do that, I think that's critical in this case because it means they have no one that can do that. Thank you. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. We've taken our advisement. We're in this position to shall issue.